IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEARY MELVIN GERMAN,<br><br>        Petitioner,<br>v.<br><br>A. A. LAMARQUE, Warden,<br><br>        Respondent. | No. C 02-1647 SBA (PR)<br><br>**ORDER DENYING<br>PETITION FOR WRIT<br>OF HABEAS CORPUS** |

# INTRODUCTION

This matter is now before the Court for consideration of Petitioner's pro se petition for writ of habeas corpus under 28 U.S.C. § 2254 concerning his conviction for murder for financial gain and conspiracy to commit murder, in Santa Clara County Superior Court. Warden Anthony A. Lamarque (hereinafter "Respondent") opposes the petition. Petitioner filed a traverse. For the reasons discussed below, the petition is DENIED as to all claims.

# BACKGROUND

## I.   Case History

On June 10, 1999, Petitioner was convicted by a jury of murdering his wife, Sharley Ann German (hereinafter "Sharley Ann"), and of conspiracy to commit murder. The jury also found true the special circumstance that Petitioner committed the murder for financial gain. On August 3, 1999, he was sentenced to a term of life without the possibility of parole. He filed a direct appeal, which was denied by the California Court of Appeal on October 18, 2001. See Resp't Ex. I. The California Supreme Court denied his petition for review on January 16, 2002. See Resp't Ex. K.

Petitioner filed this federal habeas corpus petition on April 5, 2002. Petitioner asserts the following two claims: (1) the trial court erred when it ruled his co-conspirator's statements were against his co-conspirator's penal interest, and therefore admissible under California Evidence Code section 1230, which violated Petitioner's Due Process rights to a fair trial; and (2) his Constitutional rights under the Confrontation Clause were violated when the trial court

admitted these hearsay statements against him.[1]  The Court ordered Respondent to show cause on April 22, 2002.

Respondent opposes the petition in his answer filed on June 20, 2002 (Docket no. 6) and his Memorandum of Points and Authorities in Opposition to Petition for Writ of Habeas Corpus (hereinafter "Answer") filed on July 9, 2002 (Docket no. 10).  Petitioner filed a traverse on July 15, 2002 (Docket no. 11) and a Supplemental Addendum For Writ of Habeas Corpus on September 9, 2002 (Docket no. 12).  Petitioner filed a motion for an evidentiary hearing, which this Court denied on September 30, 2003.  The matter has been fully briefed and is now ready for review on the merits.

**II.    Facts**

The facts regarding Petitioner's claim are derived from the California Court of Appeal's opinion, Respondent's Memorandum of Points and Authorities, and Petitioner's habeas corpus petition.  The parties do not dispute the following facts.

On April 25, 1986, Petitioner's wife, Sharley Ann, was killed in her home.  Her death resulted from a stab wound to the neck and a gunshot wound to the head.  Petitioner was at work at the time of the murder, and returned home shortly thereafter.  When Petitioner arrived and officers told him of his wife's death and apparent murder, he responded, "I'm tired of this shit."  One officer described Petitioner as nonchalant and unemotional.

About a year after her murder, Petitioner applied for and received about $60,000 in life insurance proceeds.  At the time of the murder, he claimed that he did not know about the policy.  The policy had been issued in 1984, shortly after Sharley Ann and Petitioner were married.

About seven months before Sharley Ann's murder, Frank Ramos was shot dead in Petitioner's garage.  Frank Ramos and Petitioner were both members of a motorcycle club called the Freedom Riders.  Petitioner was present in the garage for the shooting and was immediately

---

[1] Respondent argues that Petitioner did not present some of his claims in his direct review, however, no motion to dismiss for failure to exhaust these claims was ever filed.  Under 28 U.S.C. § 2254(b)(2), the Court may reach the merits of these claims even if they have not been exhausted.

arrested. The day after the shooting, Sharley Ann told police that Petitioner's friend, Rex Sheffield, had killed Ramos, and she showed police where the gun used to kill Ramos was hidden. Sheffield was also associated with the Freedom Riders. Sheffield had fled after the shooting, but about a month after Sharley Ann provided this information to police, he was arrested.

Petitioner pled guilty to being an accessory after the fact to Ramos's murder and received a ten month sentence, which was stayed until four days after Sharley Ann's murder. Sheffield pled guilty to involuntary manslaughter for Ramos's murder and was in prison until May 30, 1987. When Sheffield was released, Petitioner gave him $3,000 and told him to keep his mouth shut about what he knew.

Around the time of Sharley Ann's murder, Petitioner was having an affair with a coworker. Sharley Ann was aware of the affair, and she confronted Petitioner about a month before her murder. She told him that she was considering a divorce and that she would make sure he got "absolutely nothing." Petitioner told her that he would "see her dead first." He also said he would never allow another woman to "take him for everything he had" because "he could have her done like that," snapping his fingers. A few weeks after this conversation, Petitioner and Sharley Ann had a serious argument about the affair, and physically fought. Petitioner threw Sharley Ann against a car, gave her a black eye and choked her. Sharley Ann kicked Petitioner in the groin.

Before Sharley Ann's murder, James O'Malley (hereinafter "O'Malley") -- also a member of the Freedom Riders and a friend of Petitioner's -- told Gregg and Carolyn Hosac (hereinafter "Gregg" and "Carolyn," respectively) that Petitioner had hired him to kill Sharley Ann. The Hosacs were also part of the Freedom Riders. Carolyn confronted Petitioner with this information and told him that she thought he should call off the plan. Petitioner appeared stunned and lost the color in his face. He told her that it was not her concern and that he would call off the plan. Gregg also confronted Petitioner about a plan to kill Sharley Ann. Petitioner stated that he was paying to have Sharley Ann killed because she planned to divorce him and

take all of their assets.

On the night of the murder, O'Malley telephoned the Hosacs and told them "it had been done," meaning that he had killed Sharley Ann. O'Malley later complained to Gregg that he had not received the payment to which he believed he was entitled for this murder.

After Sharley Ann's funeral, Carolyn expressed concern that Petitioner's girlfriend was moving in so soon after Sharley Ann's murder. She asked Petitioner if he thought he was going to get away with it, and Petitioner responded that he already had.

After the murder, O'Malley told several other people that he had killed Sharley Ann and that Petitioner had hired him to do so. O'Malley told his friend Ted Granstedt that Petitioner had hired him to kill Sharley Ann and that O'Malley was having trouble getting paid for the murder.

O'Malley told Robert Fulton that he had killed Sharley Ann because she was going to divorce Petitioner and take everything he had. He stated that Petitioner was going to pay him $2,500 and give him Sharley Ann's car. O'Malley said he had received the car, but not the money.

O'Malley told Brandi Hohman, his girlfriend at the time, that he had been hired to kill Sharley Ann and that he had killed her.

About a year after Sharley Ann's murder, in June 1987, O'Malley and other Freedom Riders went to Petitioner's residence, assaulted him, and stole two of his motorcycles. In a preliminary hearing, Gregg testified that the motorcycles were considered part of the payment Petitioner owed O'Malley for Sharley Ann's murder. At Petitioner's trial, Gregg stated that the Freedom Riders felt that Petitioner did not deserve to ride those motorcycles anymore.

In February of 1988, police received information that O'Malley had killed Sharley Ann. Immediately after the murder, O'Malley was in possession of Sharley Ann's Honda Accord. Petitioner told various acquaintances that he had sold it to O'Malley.

Before Petitioner's trial, O'Malley was convicted of Sharley Ann's murder and two other murders. O'Malley was sentenced to death. His automatic appeal of his death sentence was

pending at the time of Petitioner's trial.

In 1992, the Hosacs came forward and provided the police with additional information about the murder, including that O'Malley had told them that Petitioner hired him to kill Sharley Ann.  After Petitioner was arrested, he was taped at the police station speaking with his wife, Gertrude German.  Petitioner told her that his attorney had told him that O'Malley was "bragging all over the place that [Petitioner] had paid him [to kill Sharley Ann]."  He stated "[b]ut I never did pay" and "[i]t can't be used against me."  Petitioner then denied his guilt.

In October of 1993, Petitioner was charged, by information, with murder for financial gain and conspiracy to commit murder.  The information alleged six overt acts as to the conspiracy charge: (1) Petitioner telephoned O'Malley between April 12, 1986 and April 25, 1986; (2) Petitioner went to work on April 25, 1986; (3) Petitioner returned from work after 3:30 p.m. on April 25, 1986; (4) O'Malley murdered Sharley Ann; (5) Petitioner gave O'Malley a vehicle -- Sharley Ann's Honda -- between March 1, 1986 and July 25, 1986; and (6) Petitioner collected life insurance policy benefits for Sharley Ann's death.

Petitioner's trial commenced on April 26, 1999.  In a pretrial motion, Petitioner sought to exclude O'Malley's statements made to third parties about Sharley Ann's murder and that Petitioner had hired him to kill her.  The prosecution argued that the hearsay statements were admissible as statements made against O'Malley's penal interest.  Petitioner argued that the portion of the statements that incriminated Petitioner were not specifically disserving of O'Malley's interests.  The trial court ruled that, by alleging that Petitioner hired O'Malley to kill Sharley Ann, O'Malley exposed himself to liability for conspiracy and for the special circumstance of murder for financial gain, both of which were against his penal interest.

At Petitioner's trial, the prosecution offered the following statements O'Malley made to friends about Sharley Ann's murder:

- Granstedt's taped interview with police, in which he states that O'Malley told him that Petitioner hired O'Malley to kill Sharley Ann and that O'Malley was having difficulty receiving payment for the murder;
- Robert Fulton's testimony that O'Malley told him shortly after Sharley Ann's murder that O'Malley had killed Sharley Ann because she was going to divorce Petitioner and take

everything, and that Petitioner was supposed to pay O'Malley $2,500 in addition to giving him Sharley Ann's car;
- Gregg Hosac's testimony that O'Malley told him that Petitioner hired O'Malley to kill Sharley Ann because if she divorced Petitioner she would take everything Petitioner owned and because she was "mouthing off" about the Freedom Riders;
- Greg Hosac's testimony that O'Malley told him about a month after Sharley Ann's funeral that O'Malley was supposed to be paid with a different car, but was given Sharley Ann's Honda instead, and that O'Malley was having difficulty getting Petitioner to pay because Petitioner did not want to make a large withdrawal so close to the murder;
- Carolyn Hosac's testimony that, while she was in Texas with O'Malley, O'Malley told her that Petitioner had hired him to kill Sharley Ann; and
- Brandi Hohman's testimony that O'Malley told her he had been hired to, and did, kill Sharley Ann.

On June 10, 1999, a Santa Clara County jury convicted Petitioner on both counts, and found the financial gain special circumstance to be true. Petitioner filed a motion for a new trial, arguing that the trial court had erred by admitting the evidence of O'Malley's statements implicating him. The trial court denied the motion and sentenced Petitioner to life in prison without possibility of parole.

## DISCUSSION

**I.      Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state court decision." Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Alvarado v. Hill, 252 F.3d 1066, 1068-69

(9th Cir. 2001). Section 2254(d)(1) "restricts the source of clearly established law to the [Supreme] Court's jurisprudence." Williams, 529 U.S. at 412.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts." Id. at 413. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 412-13.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant [s]tate court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. The objectively unreasonable standard is not a clear error standard. See Andrade, 538 U.S. at 63 (rejecting the Ninth Circuit's use of clear error standard in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)). After Andrade, "[t]he writ may not issue simply because, in our determination, a [s]tate court's application of federal law was erroneous, clearly or otherwise." Id. at 75-76. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum "it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." Id. at 75.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to petitioner's claim, that was properly presented and made part of the state-court record. Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by

clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. See Sumner v. Mata, 449 U.S. 539, 546-47 (1981); see also Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended by 253 F.3d 1150 (9th Cir. 2001).

Where, as here, the California Supreme Court denies review of Petitioner's claim without explanation, the Court looks to the last reasoned state court decision in conducting habeas review. See Shackleford v. Hubbard, 234 F.3d 1072, 1079 (9th Cir. 2000) (citation omitted), cert. denied, 534 U.S. 944 (2001) (the district court "looks through" the unexplained California Supreme Court decision to the last reasoned state court decision). In the instant case, the California Court of Appeal rendered the last reasoned state court decision.

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)). Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual" prejudice. Brecht, 507 U.S. at 637.

**II.     Legal Claims**

    **A.     Trial Court Erred in Declaring Hearsay Statements Admissible Under California Evidence Code § 1230**

        **1.     Background**

Petitioner claims that the trial court erred in finding that O'Malley's statements were statements made against O'Malley's penal interest, and therefore admissible under California Evidence Code section 1230. Petitioner argues that it was not specifically against O'Malley's interest to state that Petitioner hired him to kill Sharley Ann, and because O'Malley's statements did not have particularized guarantees of trustworthiness. Therefore, Petitioner argues that the trial court's admission of O'Malley's statements under section 1230 denied him a fair trial and

8

due process of law under the Sixth and Fourteenth Amendments.[2]

### 2. Applicable Federal Law

A person in custody pursuant to the judgment of a state court can obtain a federal writ of habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A state court's evidentiary ruling therefore is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert denied, 478 U.S. 1021 (1986); Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. See Henry, 197 F.3d at 1031. Even where it appears that evidence was erroneously admitted, a federal court will interfere only if it appears that its admission violated fundamental due process and the right to a fair trial. Id. The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process.

### 3. Analysis

Petitioner argues that the trial court erred in admitting O'Malley's statements pursuant to the hearsay exception for declarations against penal interest, as provided in California Evidence Code section 1230. To be admissible under section 1230, the proponent must show that the declarant is unavailable, the declaration is against the declarant's penal interest when made, and that the declaration is sufficiently reliable to warrant admission despite being hearsay. Cal.

---

[2] This specific claim of a violation of Petitioner's Due Process rights was not raised in his direct appeal. However, even if it has not been exhausted, this Court may reach the merits of the claim under 28 U.S.C. § 2254(b)(2).

Evid. Code § 1230; <u>California v. Duarte</u>, 24 Cal. 4th 603, 610 (2000).

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to intrinsic review of a state court's process, or situations in which the petitioner challenges the state court's findings based entirely on the state court record, whereas section 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court. See <u>Taylor</u>, 366 F.3d at 999-1000. In <u>Taylor</u>, the Ninth Circuit established a two-part analysis under sections 2254(d)(2) and (e)(1). First, federal courts must undertake an "intrinsic review" of the state court's factfinding process under the "unreasonable determination" clause of section 2254(d)(2). <u>Id.</u> at 1000. The intrinsic review requires federal courts to examine the state court's factfinding process, not its findings. "Once the state court's factfinding process survives this intrinsic review -- or in those cases where [the] petitioner does not raise an intrinsic challenge to the facts as found by the state court -- the state court's findings are dressed in a presumption of correctness . . . ." <u>Id.</u> The relevant question under § 2254(d)(2) is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the state court findings are supported by the record. <u>Lambert v. Blodgett</u>, 393 F.3d 943, 978 (9th Cir. 2004).

Because Petitioner is challenging the state court's findings based on the state court record, this Court will conduct its analysis under Section 2254(d)(2) and undertake an "intrinsic" review of the state court's process. After a careful review of the record and relevant cases, the Court is satisfied that the appellate court's conclusion that the evidence was admissible under section 1230 was not objectively unreasonable.

Before trial, the prosecution filed a motion <u>in limine</u> to admit the statements at issue,

10

arguing that they were admissible under section 1230.  The prosecution's brief did not set out the circumstances in which the statements were made.  In his in limine motion to exclude the statements, Petitioner argued that the statements were not admissible under section 1230, and that the court should conduct a hearing to ascertain the circumstances in which the statements were made to determine whether they were trustworthy.

Although the trial court did not hold an evidentiary hearing to determine the circumstances in which O'Malley's statements were made, an evidentiary hearing is not required for the factfinding process to be reasonable under section 2254(d)(2).  See Buckley v. Terhune, 397 F.3d 1149, 1157- 58 (9th Cir. 2005).  Both parties briefed the issue, and the court held oral argument on the motions in limine on March 31, 1999.  At the hearing, both sides presented their arguments regarding the admission of the statements and the circumstances in which they were made.  The prosecutor did not address the circumstances of the statements in much detail, but instead focused on arguing that the statements were admissible under the hearsay exception for a co-conspirator's statements.  The prosecutor argued that O'Malley's statements were trustworthy because they were made from his personal knowledge and accurately detailed the circumstances of Sharley Ann's murder.  The prosecutor noted that the court was already familiar with O'Malley's statements after previously presiding over O'Malley's trial -- the same statements the prosecutor sought to admit against Petitioner were admitted against O'Malley at his trial.  The court also confirmed its familiarity with O'Malley's trial.  While the court did not order an evidentiary hearing, the court was aware of the circumstances in which the statements were made.  The court found that O'Malley was speaking (1) to acquaintances, (2) spontaneously, (3) from personal knowledge and (4) at least partly with the motive to recover the payment owed him.  The court concluded that the statements were neither  made during a custodial interrogation, nor in a coercive atmosphere.  Furthermore, the court determined that the statements were made without the motive to shift blame.  Additionally, the appellate court affirmed the trial court's decision in a reasoned decision, finding that the trial court did not err in its findings.  This Court concludes that the trial court fully considered the

circumstances in which O'Malley made his statements, and that it was not necessary to conduct an evidentiary hearing. Therefore, the Court concludes that the factfinding process used by the trial court was intrinsically reasonable.

Upon finding that the state court's factfinding process survives an intrinsic review, the Court now turns to the state court's determination of the facts, which is "dressed in a presumption of correctness." Taylor, 366 F.2d at 1000. The trial court found that "[t]he admission that [Petitioner] paid for it . . . is evidence of a conspiracy and a financial gain special circumstance, and therefore [was] very much against [O'Malley's] penal interest." See Resp't Ex. I at 5. The trial court further found that the statements contained an indicia of trustworthiness because they "were not made during a custodial interrogation nor with a motive to shift or spread blame." Id. at 5-6. Furthermore, the trial court found that the jury that previously convicted O'Malley had, by implication, found the statements to be true and trustworthy after being admitted into evidence. Id. The California Court of Appeal upheld the trial court's determination that O'Malley's statements were against his penal interest because the statements provided "evidentiary proof that he was guilty of conspiracy and murder for hire." The appellate court specifically found that the trial court "did not err by determining that O'Malley's unredacted statements were against his penal interest when made." Id. at 11-12.

Whether the statements were against penal interest and were reliable are factual determinations, and whether O'Malley's statements were properly admitted under California evidence rules is a state law question. This Court must presume correct a state court's determination of any factual question. See Lilly v. Virginia, 527 U.S. 116, 136-37 (1999). Because the state courts have already reached and determined this question, absent any clear and convincing evidence to the contrary, this Court must presume correct the state courts' determination that O'Malley's statements were against his penal interest when made, and that they were sufficiently reliable to support admission.

Petitioner has not provided any evidence that rises to the level of clear and convincing evidence to allow this Court to conclude that the state courts made an unreasonable

determination of the facts in light of the evidence presented. To rebut the presumption of correctness, Petitioner first argues that O'Malley had a motive to lie about Petitioner's involvement. By implicating Petitioner as hiring him to kill Sharley Ann, Petitioner argues that O'Malley absolved himself of any reprisal from the Freedom Riders for killing a member's wife. However, O'Malley's statements exposed him to significant criminal liability for conspiracy and murder for hire, which are against his penal interest. Petitioner also argues that O'Malley was a pathological liar and was under the influence of drugs when making at least one of the statements, and that the statements were therefore not reliable. However, the Court of Appeal found that O'Malley had a motive to be accurate about the fact that Petitioner hired him because he was attempting to recover the payment Petitioner owed him. The appellate court also noted that O'Malley repeated his statement several times to different people, and that this constant repetition indicated the statements were truthful. The appellate court found that the trial court observed the evidence at trial and could have reasonably determined that no basis existed to conclude that O'Malley had a motive to be untruthful. While Petitioner presented evidence that O'Malley may have had a motive to lie, his evidence does not rise to the level of clear and convincing evidence sufficient to rebut the presumption of correctness. See Buckley, 397 F.3d at 1160-61 (petitioner did not rebut presumption of correctness where, despite evidence to the contrary, there was sufficient evidence from which the state court could reasonably conclude that petitioner had agreed to sentence he received). Therefore, the Court concludes that the state courts' decisions were not "objectively unreasonable."

Because the factual basis sufficient to meet the requirements of section 1230 is a question of state law that has already been ruled upon by the state courts and has not been rebutted by Petitioner, the Court must presume correct any determination of a factual issue made by a state court. See 28 U.S.C. § 2254(e)(1).

Accordingly, Petitioner is not entitled to habeas relief on this claim.

//

//

13

**B.     Confrontation Clause Claim**

    **1.     Background**

Petitioner argues that the admission of O'Malley's hearsay statements violated his rights under the Confrontation Clause to confront witnesses against him because he was not given an opportunity to cross examine O'Malley.

    **2.     Applicable Federal Law**

        **a.     Confrontation Clause Violation**

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 403 (1965).

At the time the California Court of Appeal rendered its decision in this case, the governing standard was Ohio v. Roberts, 448 U.S. 56 (1980), which held that out-of-court testimonial statements may be admitted as long as the witness is unavailable and the statements have "adequate indicia of reliability," i.e., fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." Id. at 66. The appellate court that reviewed this claim on direct appeal applied this standard and concluded that the statements contained sufficient indicia of reliability to render them admissible under the Confrontation Clause. See Resp't Ex. I at 15. However, Crawford v. Washington, 541 U.S. 36 (2004), decided after Petitioner's case became final on direct appeal, but before he filed this petition, overrules Roberts. Crawford applies retroactively to collateral attacks. Bockting v. Bayer, 399 F.3d 1010, 1020 (9th Cir. 2005).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford, 541 U.S. at 61. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner -- by testing in the crucible of cross-examination. Id.; see Davis v. Alaska, 415 U.S. 308, 315 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination). The

Confrontation Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined. Crawford, 541 U.S. at 61.

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." See Crawford, 541 U.S. at 51. While the Supreme Court has not articulated a comprehensive definition of testimonial hearsay, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. at 68; see, e.g., Bockting, 399 F.3d at 1021 (statements made by child-victim in interview with police were testimonial hearsay governed by Crawford). "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford, 541 U.S. at 51 (citations and quotation marks omitted). The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. Id. at 50-51.

Out-of-court statements by witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witnesses are unavailable, and (2) the defendant had a prior opportunity to cross-examine the witnesses. Crawford, 541 U.S. at 59. The reliability of such statements, for Confrontation Clause purposes, depends solely upon these two factors. See id. at 68. Thus, the Supreme Court's prior holding in Ohio v. Roberts, that such statements may be admitted so long as the witness is unavailable and the statements have "adequate indicia of reliability," i.e., fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness," is overruled by Crawford. See id.

### b. Harmless Error Standard

Confrontation Clause claims are subject to harmless error analysis. United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004) (post-Crawford case). For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury. See Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing Brecht, 507 U.S. at 637).

15

Federal courts formerly applied the Chapman harmless error standard to all criminal convictions tainted by trial error. Under this test "before a federal constitutional error can be harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). While the Chapman standard remains applicable to criminal convictions challenged on direct appeal, the Supreme Court has adopted a less strict standard for federal habeas corpus. See Brecht, 507 U.S. at 637-38. A habeas petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or influence in determining the jury's verdict." Id. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted).[3]

The proper question in assessing harm in a habeas case is to ask whether "the error substantially influenced the jury's decision." O'Neal v. McAninch, 513 U.S. 432, 436 (1995) (internal quotations omitted). If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. Id. at 437. If, on the other hand, the court is not fairly assured that there was no effect on the verdict, it must reverse. Id. In the "narrow circumstance" in which the court is in "grave doubt" about whether the error had substantial and injurious effect or influence in determining the jury's verdict, it must assume that the error is not harmless and the petitioner must win. Id. at 436, 438; see, e.g., id. at 436-44 (relief granted because record so evenly balanced that conscientious judge in grave doubt as to harmlessness of error).

A federal habeas court reviewing the prejudicial effect of constitutional trial error does not simply examine whether there was sufficient evidence to support the conviction in the absence of constitutional error. Rather, regardless whether there is sufficient evidence to

---

[3] The Brecht standard for actual prejudice is identical to that used in federal direct appeal cases for finding plain error which affected substantial rights. Lee v. Marshall, 42 F.3d 1296, 1298-99 (9th Cir. 1994).

16

support the conviction apart from the error, the court must determine whether the error had a substantial and injurious effect or influence on the conviction.  If it did, the court must set aside the conviction.  Ghent v. Woodford, 279 F.3d 1121, 1127 (9th Cir. 2002).

A trial error is considered harmless under Brecht only if the *actual* jury in the case would have reached the same verdict absent the error.  Gray v. Klauser, 282 F.3d 633, 654-55 (9th Cir.), judgment vacated on other grounds, 537 U.S. 1041 (2002) (emphasis in original).  Therefore, a court must not go beyond the record in deciding the likely effect if the error had not occurred.  Id. at 655.

Although the Eighth Circuit has held that when the state court did not have the opportunity to review the error at all and the federal habeas court is the first to review the constitutional error, the appropriate harmless error test may be the Chapman standard, Orndorff v. Lockhart, 998 F.2d 1426, 1430 (8th Cir. 1993), the Ninth Circuit has rejected that conclusion and held that the Brecht standard applies uniformly in all federal habeas corpus cases under § 2254.  Bains v. Cambra, 204 F.3d 964, 977 (9th Cir.), cert. denied, 531 U.S. 1037 (2000).

**3.      Analysis**

O'Malley's out-of-court statements that Petitioner hired him to kill Sharley Ann are hearsay statements because they were admitted to prove the truth of the matter asserted. Although made spontaneously to acquaintances, they are testimonial hearsay statements because they were admitted at trial.  Crawford, 541 U.S. at 50-51.  Admission of these statements, therefore, was a constitutional violation under Crawford unless O'Malley was unavailable and Petitioner had a prior opportunity to cross-examine him.

Petitioner does not dispute that O'Malley was unavailable, because O'Malley's automatic death penalty appeal was pending at the time of Petitioner's trial, and O'Malley would have thus invoked the Fifth Amendment privilege not to testify.  Additionally, neither party disputes that Petitioner did not have an opportunity to cross-examine O'Malley.  Under Crawford, therefore, the Court finds that the admission of O'Malley's hearsay statements against Petitioner was constitutional error.

17

However, the Court must next assess whether this error was harmless. In the context of a federal court reviewing a state conviction in a habeas petition, this means that the evidence must have had an "actual and prejudicial effect upon the jury." Hernandez, 282 F.3d at 1144. Petitioner argues that the error was not harmless because O'Malley's statements were crucial to the prosecution's case, since the prosecution's theory at trial was that Petitioner hired O'Malley to kill Sharley Ann rather than go through the expense of a divorce. He argues that the event that triggered his criminal prosecution was the discovery of witnesses willing to testify about O'Malley's statements implicating Petitioner. He points to the six-year delay between Sharley Ann's murder and his prosecution as evidence that the introduction of O'Malley's hearsay statements implicating him was integral to the prosecution's case.

Respondent argues that any constitutional error was harmless in this case, as it did not have an active and injurious effect on the verdict. Respondent also argues that there was substantial evidence aside from O'Malley's statements that supported the jury's verdict that Petitioner hired O'Malley to kill Sharley Ann. Petitioner was having an affair, of which his wife was aware, and his wife had threatened to divorce him and leave him penniless. Petitioner had stated that he would not allow this to happen and that he could have her "done like that." Prior to the murder, he and Sharley Ann had been involved in a physical altercation when discussing the divorce. When the Hosacs confronted Petitioner about a plan to hire O'Malley to kill Sharley Ann, Petitioner did not deny the plan and said that he would call it off. After the murder, his reaction to his wife's death was characterized as odd by several people, and he told Carolyn that he had already gotten away with the murder. After Sharley Ann's death, the woman with whom he had had the affair moved into his house. Furthermore, after the murder, O'Malley was in possession of Sharley Ann's car. Petitioner also applied for and received about $60,000 in life insurance proceeds about a year after Sharley Ann's murder.

Taking into consideration this substantial evidence, the actual jury would have reached the same verdict even without the admission of O'Malley's statements. See Gray, 282 F.3d at 654-55. Therefore, the alleged trial error of admitting these hearsay statements is harmless

1  under Brecht because it did not have an "actual and prejudicial effect upon the jury."[4]

2  Hernandez, 282 F.3d at 1144.

3        Accordingly, Petitioner is not entitled to habeas relief on his Confrontation Clause

4  claim.

## CONCLUSION

6        For the foregoing reasons, the petition for a writ of habeas corpus is DENIED on all

7  claims. The Clerk of the Court shall enter judgment and close the file.

8  IT IS SO ORDERED.

10  DATED: 8/9/05

                                            SAUNDRA BROWN ARMSTRONG
                                                United States District Judge

---

[4] Petitioner also argues that the admission of O'Malley's statements violated his Due Process rights to a fair trial. "The due process inquiry in federal habeas review is whether the admission of evidence was so arbitrary or prejudicial that it rendered the trail fundamentally unfair." Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995). This Court, however, has found that Petitioner has not rebutted the presumption of correctness of the trial court's determination that the statements were admissible under section 1230, and that the statements were therefore not erroneously admitted. Assuming arguendo that the statements were admitted erroneously, the Court must conduct a harmless error analysis. This is essentially the same inquiry as that of Petitioner's claim of a violation of the Confrontation Clause, because both inquiries require the Court to examine whether the admission of the statements had an actual or prejudicial effect. See Hernandez, 282 F.3d at 1144 (harmless error standard for confrontation clause violation is whether admission of statements had actual and prejudicial effect). Because the Court concludes supra that the admission of the statements did not have a prejudicial effect upon the verdict, the Court will not duplicate its analysis here.